**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. TDC-19-380 |
| | * | |
| KAIRI MUGADDIM, | * | |
| | * | |
| Defendant | * | |
| | * | |
| ****** | | |

**OPPOSITION TO MOTION FOR BOND REVIEW**

On March 31, 2020, the defendant filed a motion for release pending sentencing. The only novel claim in this motion is that COVID-19 is a changed circumstance meriting the defendant's release. This Court and the United States District Court for the District of Columbia recently have denied similar claims for detainees (such as this defendant) housed in facilities run by the D.C. Department of Corrections ("DOC"). *See United States v. Martin*, PWG-19-140 (D. Md.), ECF No. 209 (Order by Judge Grimm); *United States v. Bilbrough*, TDC-20-33 (D. Md.), ECF No. 76 (Order by Magistrate Judge Sullivan); *United States v. Parker*, TDC-18-344 (D. Md.), ECF No. 478 (Order by Magistrate Judge Simms); *United States v. Jefferson*, CCB-19-487 (D. Md.), ECF No. 25 (Order by Judge Blake); *United States v. Williams*, PWG-13-544 (D. Md.), ECF No. 94 (Order by Magistrate Judge Day); *United States v. Rivas*, TDC-19-417 (D. Md.), ECF No. 72 (Order by Magistrate Judge Sullivan); *United States v. Chriscoe*, TDC-20-46 (D. Md.), ECF No. 131 (Order by Magistrate Judge Coulson); *United States v. Beamon*, PX-19-570 (D. Md.), ECF No. 37 (Order by Judge Xinis); *United States v. Hill*, APM-19-260 (D.D.C.), Minute Order dated March 19, 2020. Because the defendant's generic argument runs counter to the individualized determination required by the Bail Reform Act, and because the defendant has failed to make a

sufficient factual showing for the relief sought, this Court should do the same and deny the motion, without a hearing.

## Background

On March 18, 2019, the defendant was arrested pursuant to a federal indictment in criminal no. TDC-19-0126, which charged him with: (Count One) Conspiracy to Interfere with Interstate Commerce by Robbery, in violation of 18 U.S.C. § 1951(a); (Count Two) Interference with Interstate Commerce by Robbery, in violation of 18 U.S.C. § 1951(a); (Count Three) Use, Carry, and Brandish a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c); (Count Four) Interference with Interstate Commerce by Robbery, in violation of 18 U.S.C. § 1951(a); and (Count Five) Use, Carry, and Brandish a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c).  At a detention hearing on March 20, 2019, the Government set forth substantial evidence in favor of detention, including the nature and circumstances of the offense, the defendant's prior criminal history, and the defendant's prior violations of terms of supervision.  At the conclusion of the hearing, the Court detained the defendant, finding that no release condition would reasonably assure the safety of any other person and the community.  Specifically, the Court found that the defendant had not introduced evidence to rebut the presumption in favor of detention arising under 18 U.S.C. § 3142(e)(3).

On July 25, 2019, the above-referenced charges were dismissed without prejudice to refile due to a violation of the Speedy Trial Act.  On August 7, 2019, the charges were refiled once a federal grand jury for the District of Maryland returned an indictment in the above-captioned matter charging the defendant with the same five counts that had previously been dismissed.  These charges alleged the same conduct as the charges referenced above in criminal no. TDC-19-0126,

and were docketed as the case at bar.  The defendant was arraigned on August 12, 2019.  ECF No. 3.

On January 16, 2020, the defendant formally pled guilty, pursuant to an agreement with the government, to Counts Four and Five of the Indictment pending against him, and in the stipulation of facts agreed to participating in the commission of a total of three armed robberies of armored trucks.  ECF No. 26-1.  Sentencing is scheduled for May 7, 2020 at 10:00 a.m.

On March 31, 2020, the defendant filed a motion for bond review.  ECF No. 33.  The defendant's only argument in favor of release is speculation regarding COVID-19.  As detailed below, the motion should be denied without a hearing.

## Argument

The defendant relies on the speculative prospect of a mass COVID-19 outbreak at the D.C. Jail, the pretrial facility where he currently is housed.  While the Government understands that currently six DOC inmates (five and possibly six of whom were housed at CTF at the time of illness) have been diagnosed with COVID-19, the defendant does not allege that he has been diagnosed with COVID-19, or even that he has had contact with any of the detaines who have been diagnosed with COVID-19.  Further, as described further below, D.C. Jail continues to take precautionary measures to prevent transmission of COVID-19 into D.C. Jail, including taking immediate action with regard to the detainees who have tested positive.  The defendant's motion should be denied, without a hearing.[1]

---

[1] A defendant may appeal a Magistrate Judge's detention order to the District Court.  18 U.S.C. § 3145(b).  In considering such an appeal, the District Court reviews the Magistrate Judge's detention order *de novo*.  *United States v. Stewart*, 19 Fed. App'x 46, 47 (4th Cir. 2001).  Thus, the District Court must make "an independent determination of the proper pretrial detention or conditions of release." *Id.*  The district court need not conduct a new pretrial detention hearing; rather, the court may base its decision on the original detention hearing and any additional evidence proffered by counsel.  *See United States v. Williams*, 753 F.2d 329, 331 & n.7 (4th Cir. 1985).

## I. Legal Standard

Because the defendant is awaiting sentencing, under 18 U.S.C. § 3143, the defendant *must* be detained unless the Court can conclude by clear and convincing evidence that the defendant is not likely to flee or pose a danger to any other person or the community. *See United States v. Adams*, DKC-19-257-003 (D. Md.), ECF No. 87 (Order by Judge Chasanow) (explaining § 3143(a)(2) requirements and holding defendant failed to meet them).

## II. Pursuant to 18 U.S.C. § 3143(a)(2), the Defendant Cannot Obtain the Relief He Is Seeking

As set forth above, the defendant has already pleaded guilty and therefore is seeking release pending sentencing. Under 18 U.S.C. § 3143(a)(2), no hearing is necessary as the defendant cannot obtain the relief he is seeking. That provision provides:

> **(2)** The judicial officer shall order that a person who has been found guilty of an offense in a case described in subparagraph (A), (B), or (C) of subsection (f)(1) of section 3142 and is awaiting imposition or execution of sentence be detained unless—
>
> **(A)** **(i)** the judicial officer finds there is a substantial likelihood that a motion for acquittal or new trial will be granted; or **(ii)** an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person; and
>
> **(B)** the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community.

The defendant must be detained *unless* he meets all the requirements of § 3143. And § 3143(a)(2) imposes additional restrictions for releasing a defendant who has been found guilty and is awaiting sentencing if his crimes of conviction fall into certain categories covered by § 3142(f)(1), which lists serious offenses that trigger special considerations during a detention hearing prior to conviction. Because the defendant pled guilty to Interference with Interstate Commerce by Robbery, in violation of 18 U.S.C. § 1951(a), and Brandishing a Firearm During

and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924c, which qualify pursuant to 18 U.S.C. §§ 3142(f)(1)(a) & (b), respectively, the threshold requirements of § 3143(a)(2) apply.

Thus under § 3143(a)(2), as a threshold consideration, the defendant needs to show that (1) there is a substantial likelihood that he will win a motion for acquittal or be given a new trial *or* (2) that the Government has recommended a sentence of no prison time. The defendant pleaded guilty pursuant to a written agreement and has not moved to withdraw. Therefore, there is no possible avenue for acquittal and a new trial is not a possibility. And the Government has not and has no plans to recommend a sentence that does not include prison time. Indeed, the Government and the defendant have agreed to recommend that the Court bind itself to a sentence of not less than 120 months and not greater than 168 months of imprisonment. Before even determining whether the defendant can prove to this Court under a clear and convincing standard that he poses no danger to the community and is not a risk to flee, the defendant cannot meet the requirements under § 3143(a)(2)(A). Accordingly, this Court should deny the defendant's motion without a hearing. *See Adams*, Crim. No. DKC-19-257-003, ECF No. 87 (denying motion for a hearing on release where Defendant bank robber, who had pleaded guilty and had consented to detention hearing, failed to make a showing that COVID pandemic constituted extraordinary reason permitting his release and also failed to show by clear and convincing evidence that he was not a danger or a flight risk).

**III.     The Defendant's Motion Ignores Nearly All of the § 3142 Factors, Which Weigh Heavily in Favor of Detention.**

In this case, an examination of the § 3142 factors demonstrates that the detention order should remain in place.

**A.     The Nature and Circumstances of the Offense**

The nature and circumstances of the offenses, as set forth in the Stipulation of Facts to the plea agreement, strongly favor detention.  In fact, the nature of the charges alone create a rebuttal presumption in favor of detention, a presumption that Judge Day has previously found was not rebutted by the defendant.  *See* ECF No. 26-1.

### B. Weight of the Evidence

As noted previously, the defendant knowingly and voluntarily entered a plea of guilty to the conduct described in the Stipulation of Facts.  ECF No. 26-1

### C. History and Characteristics of the Person

As noted in the PSR, the defendant has a criminal history score of 17, resulting in a criminal history category of VI, the highest possible category.  PSR at ¶69.  The characteristics of this criminal history include a prior conviction in this Court for Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g), which resulted in a 72 month sentence. *Id.* at ¶64.  In fact, the defendant's guilty plea in this case was the *fifth* time the defendant has been found guilty of a firearm-related offense.  *Id*. at ¶¶ 56, 57, 62, 64.  The defendant has also twice been found guilty of crack cocaine and cocaine trafficking   *Id*. at ¶ 59, 67.

### D. The Nature and Seriousness of the Danger to the Community in the Event of the Defendant's Release

The defendant has repeated failed to abide by conditions of supervision as set by various courts.  He was arrested and subsequently convicted of two cocaine related offenses while on supervised release in this Court, resulting in additional imprisonment for violating the terms of his supervised release.  *Id*. at ¶ 64.  The offenses contained in the Stipulation of Facts began approximately three months after the defendant was released from imprisonment for violating his supervised release.  In that time he had unlawfully procured an assault rifle style firearm used in the offenses referenced in the statement of facts.  The proceeds of one of these offenses was

$120,000 in U.S. currency. He was also found in violation of his probation in 1999, 2005, 2007, and 2009. *Id*. at ¶¶ 55, 58, 63. The defendant's history and characteristics demonstrate that he represents an unacceptable danger of violence should he be released.

**IV.     D.C. Department of Corrections Has Established Comprehensive Procedures to Avoid a COVID-19 Outbreak.**

The defendant's motion does not contest the Government's analysis, focusing instead on the potential health risks posed by COVID-19 and ignoring the other § 3142 factors the Court must consider in determining whether a defendant poses a danger to the community and a flight risk. To be sure, the Bail Reform Act instructs courts to consider the "physical and mental condition" of the defendant as one of the factors in its analysis. 18 U.S.C. § 3142(g)(3)(A). Notwithstanding the COVID-19 outbreak, that factor does not weigh heavily, if at all, in favor of the defendant's release. The defendant does not allege that he has COVID-19 or even that he has been exposed to any individuals with COVID-19. In this way, he is not seeking release based on his *actual* "physical and mental condition." Instead he relies solely on the *possibility* of becoming infected. As discussed below, however, DOC, which oversees the D.C. Jail and CTF, has implemented substantial precautionary measures to mitigate this risk.

**A.     Comprehensive Precautionary Measures Have Been Instituted to Avoid Transmission of COVID-19.**

DOC has undertaken comprehensive precautionary measures to protect detainees from exposure to COVID-19. As additional measures are implemented, DOC is alerting the public to the precautions. *See* https://doc.dc.gov/page/coronavirus-prevention. In addition to the information on the public webpage, the Government has learned the following by communicating with the United States Marshals Service ("USMS") and DOC's General Counsel.[2]

---

[2] The Government is getting continual updates on the situation at D.C Jail and CTF from the USMS and DOC. Any discrepancies between this filing and prior filings, whether in this or other

DOC has installed an "Incident Command System." Each day, the heads of DOC and relevant agencies meet to discuss COVID-19 issues as they pertain to the D.C. jails, to discuss strategies to combat any possible spread of COVID through the D.C. jails, to track national trends, and to make sure DOC's policies are consistent with those national trends and with recommendations from the Centers for Disease Control and the D.C. Department of Health.

DOC also has taken various steps to protect its facilities, to screen visitors and incoming detainees at intake, to maintain cleanliness within the facilities, and to increase its medical coverage within facilities, including:

- **No Non-Legal Visitation:** As of Saturday, March 14, 2020, DOC suspended all non-attorney in-person visits, programming, and volunteer activities, and has enhanced cleaning efforts, especially within common areas. For staff and legal visitors, DOC performs a COVID-19 screening for these limited visitors. The screening includes asking a series of questions to determine possible exposure to COVID, observing whether the person is displaying flu-like or COVID-associated symptoms, and taking their temperature. Anyone displaying symptoms, giving a positive response, or showing an elevated temperature, is denied entry into the facility.

- **Inmate Screening and Awareness:** All new detainees and inmates are subject to similar COVID-19 screening. If an inmate presents with symptoms or provides affirmative answers during screening, they are provided a face mask and taken to medical. Medical does an assessment and makes determination about whether transport to the hospital is appropriate. Furthermore, facility staff are going through the jail units and reminding detainees to put in requests for sick call to see medical if they are feeling poorly. Staff are reminded at roll calls about the need for various preventative measures.

---

cases in this District, reflect additional or revised information obtained in the interim. The Government recognizes that the situation is fluid and is trying to deliver the best information to the Court as we understand it at the time.

It should be noted that the defense motion relies upon a press release issued by the Fraternal Order of the Police ("FOP")—a union representing DC DOC correctional officers—which makes allegations that dispute some portions of the DC DOC's information. According to USMS, who visited the facility on March 30, 2020, the FOP's descriptions of the facility operations are not consistent with USMS's observations. USMS reported the guards were wearing gloves and masks and there were hand sanitizer dispensers mounted and being used throughout the facility. The facility is also conducting medical evaluation of all employees and visitors prior to entering the facility. The government and USMS continues to seek information from DC DOC regarding the allegations in the FOP press release.

- **Quarantine:** Particular units have been set up to operate as quarantine locations. Detainees are placed in quarantine locations if they show flu-like or COVID-like symptoms.

- **Extra Cleaning:** Additional measures have been taken to maintain cleanliness of facilities, detainee hygiene, and access to (and awareness of) medical treatment. DOC has increased its supply of cleaning and sanitation materials. They currently have 55,000 bars of soap and are issuing inmates one bar of soap each week, in addition to allowing additional purchases of soap through commissary. Posters are placed throughout the facilities to remind detainees about preventative measures they can take. DOC staff puts emphasis on maintaining clean surfaces, avoiding touching, and other similar precautions. In addition to standard cleaning, staff perform cleaning spot checks every two hours. A cleaning unit goes through areas common areas to clean frequently touched areas like elevator buttons, escalators, and railings.

As of March 27, 2020, at 4:30 p.m., DOC has implemented additional measures to mitigate the possible spread of COVID-19 by modifying the movement of detainees and inmates as follows:

**Cancellation of Certain Activities:** Off-unit religious services have been cancelled, off-unit activities have been halted, and barbering/cosmetology services have been suspended at this time.

**Reduction of Out-of-Cell Time**: Modified recreation will include a reduction in out-of-cell time (minimum of 2.5 hours daily) to reduce the number of social contacts.

The defendant's motion does not refute these DOC precautionary measures or allege that these measures are insufficient to address the needs of detainees. Rather, the defendant's motion highlights (1) various press articles and other limited information regarding DOC detainees who have tested positive for COVID-19 but are currently in quarantine; (2) a Deputy U.S. Marshal ("DUSM") in D.C. Superior Court who has tested positive for COVID-19; (3) a Centers for Disease Control ("CDC") guidance document; and (4) a press release issued by the Fraternal Order of Police, a union representing D.C. DOC Correctional Officers. This information does not merit the defendant's release. *See Williams*, PWG-13-544 (acknowledging that DOC has taken significant measures to stem the tide of the pandemic, and recognizing that "[s]hould the unfortunate event occur, the correctional authorities have in place a plan of action that should not

9

be summarily embraced or discarded. Nor does it follow that a presumption of release materializes without more details about the impact upon [the defendant] directly.")

With respect to the DOC detainees who have tested positive, the Government has obtained the following information:

Detainee #1: a 20-year-old male previously housed in CTF, D Building. Since on or about March 21, 2020, the detainee was housed in a single-occupancy cell. On March 25, 2020, medical staff determined that the detainee had a fever and immediately tested the detainee for the virus; the test came back positive later that evening. The detainee is currently in isolation in DOC's infirmary.

Detainee #2: a 44-year-old male previously housed in CTF, D Building, before being moved to isolation in the Special Management Unit B. The detainee is currently in isolation in DOC's infirmary.

Detainee #3: a 37-year-old male previously housed in CTF, D Building, before being moved to the quarantine unit on March 26, 2020 as a precautionary measure after an individual from the same unit tested positive for COVID-19. The detainee is currently in isolation in DOC's infirmary.

Detainee #4: a 38-year-old male previously housed in CTF, D Building, before being moved to the quarantine unit on March 26, 2020 as a precautionary measure after an individual from the same unit tested positive for COVID-19. The detainee is currently in isolation in DOC's infirmary.

Detainee #5: a 37-year-old male previously housed in CTF, D Building, before being moved to quarantine unit on March 26, 2020, as a precautionary measure after an individual from

the same unit tested positive for COVID-19. The detainee is currently in isolation in DOC's infirmary.

Detainee #6: an individual who tested positive on or about March 31, 2020 and is currently in isolation at DOC's infirmary. He is in stable condition.[3]

For each of these detainees, DOC's medical team and Unity Health Care are working with the D.C. Department of Health ("DOH") on contact tracing and to protect the health and wellbeing of other DOC detainees. As part of these measures, as of March 28, 2020, approximately 29 total DOC detainees were in various forms of quarantine.

With respect to the DUSM, as of March 19, 2020, DOC took immediate, responsible action to address any potential threat. For example, DOC has identified DOC inmates and detainees who appear to have been in the vicinity of the DUSM and is screening those inmates and detainees for illness. Pending screening, those inmates and detainees have been separated from the rest of the DOC population. Likewise, USMS has taken steps to mitigate any risk from DOC and USMS personnel in the vicinity of the DUSM. Specifically, USMS sent home 95 deputies who had at least moderate contact with the DUSM in order to permit those individuals to self-quarantine; deputies from other jurisdictions were brought in to handle court matters.

Defendant's reliance on certain goals in the Centers for Disease Control and Prevention's ("CDC") guidance document for correctional officers not having, apparently, been implemented yet in the DOC does not alter the inquiry. As the CDC guidance document itself acknowledges, "**[t]he guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions.**" (ECF No. 33, Ex. E, at 1 (emphasis in original).) The CDC continued: "**[D]ifferent facility types (e.g., prison vs. jail)**

---

[3] Two additional detainees have been tested and, as of March 31, 2020, are awaiting results. They are currently housed in DOC's quarantine and observation units.

**and sizes are not differentiated. Administrators and agencies should adapt these guiding principles to the specific needs of their facility.**" (*Id.* at 3 (emphasis in original). Accordingly, this information does not repudiate the measures that the DOC *has* taken to date. *Accord, e.g.*, *United States v. Adams*, DKC-19-257-003 (D. Md.), ECF No. 87 (Order by Judge Chasanow) (March 25, 2020), at 4 ("The correctional and medical staff at detention facilities continue to provide appropriate safeguards for the health and safety of those committed to their custody."); *United States v. Bilbrough*, TDC-20-033 (D. Md.), ECF No. 76 (Order by Judge Sullivan) (March 20, 2020), at 6 ("The D.C. Department of Corrections appears to be taking reasonable steps to prevent and combat the spread of COVID-19 in its facilities."); *United States v. Sturmer*, GJH-18-468 (D. Md.), ECF No. 287 (Order by Judge Simms) (March 27, 2020), at 4 (noting, in declining a request for release, that "there is evidence that the staff at [the D.C. Jail] is implementing prophylactic and other measures in response to the virus, including monitoring, screening and cleaning").[4]

With respect to the FOP press release, the FOP makes allegations that dispute some portions of the DOC's information. However, according to the USMS, which visited one of the DOC's facilities on March 30, 2020, certain of the FOP's descriptions of facility operations are

---

[4] *See also, e.g.*, *United States v. Parker*, TDC-18-344 (D. Md.), ECF No. 478 (Order by Judge Simms) (March 21, 2020), at 8 (noting that a defendant's "increased risk of fighting off the COVID-19 virus . . . exists, too, even if he were not housed at CT[F]," and relying, in denying release, on the lack of evidence that the defendant had been housed with or come into contact with infected individuals and on the information that the DOC "has implemented prophylactic and other measures in response to the COVID-19 virus, including suspension of visits by most outside visitors, monitoring inmates, setting up quarantine locations, screening and cleaning"); *United States v. Jefferson*, CCB-19-487 (D. Md.), ECF No. 25 (Order by Judge Blake) (March 23, 2020), at 2 n.1 (citing, in denying release, that "precautionary measures have been implemented at CTF in light of the COVID-19 pandemic"); *Williams*, PWG-13-544 (D. Md.), ECF No. 94 (Order by Judge Day), at 4 (noting, as to health vulnerabilities and the complications they can create for people incarcerated, that "[t]hese are challenges that cannot be denied, but as they relate to the issue of release, they are concerns not concrete enough to justify the release of [the defendant]").

not consistent with USMS's observations. The USMS reported to the Government and Chief Judge Bredar that the guards were wearing gloves and masks and that there were hand sanitizer dispensers mounted and being used throughout the facility. According to the USMS, the facility is also conducting medical evaluation of all employees and visitors prior to entering the facility. The Government and the USMS continue to seek information from the DOC regarding the allegations in the FOP press release, as well. But for now, the FOP press release should be taken only as that—a press release containing unproven allegations that are at least inconsistent with certain first-hand, recent observations by the USMS.

Each of these reasonable steps is intended to address the actual threat posed by COVID-19 in DOC facilities, and is far more relevant to the Court's determination than the hypothetical speculation that is the focus of the defendant's motion.

### B. The Defendant's Individual Circumstances Do Not Merit Release.

While the COVID-19 virus is new, health claims by detainees are not. Courts have generally recognized that "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where otherwise detention would be warranted. *United States v. Wages*, 271 Fed. App'x 726, 728 (10th Cir. 2008). These cases recognize that reasonably necessary treatments are available in prison, and often times a prison setting will provide superior care than a defendant can obtain on the outside. *See United States v. Rodriguez*, 50 F. Supp. 2d 717, 722 (N.D. Ohio 1999). In this case, the defendant simply has not made a factual record that his needs will not be met while detained. Granting a defendant's motion for release based on a general, speculative claim of harm flies in the face of the defendant-specific analysis required by 18 U.S.C. § 3142(f).

### V. Releasing the Defendant And Others Similarly Situated Would Place an Undue Burden on Pretrial Services and the Court, Thereby Increasing Community Danger.

Awarding relief here, and in similar cases, would place a substantial and unwarranted burden on the Pretrial Services Division of the U.S. Probation Office, as well as the Court. Whenever the Court orders electronic monitoring, a Location Monitoring Specialist is appointed to oversee the defendant's pretrial release. To be sure, one case, by itself, would not strain the system. But if the Court released the defendant, then undoubtedly an avalanche of defendants would also seek release. Each defendant would make the generic argument, now being made by the defendant, that he should be released to reduce contact with other persons and have greater access to healthcare in the community—notwithstanding the fact that, twice now, the Court has detained the defendant to protect the community *from* him. The speculative prospect of a COVID-19 outbreak at D.C. Jail does not diminish the public interest in keeping the defendant off the streets based on a judicial finding of dangerousness that cannot be ameliorated by any combination of release conditions. And if the Court did release the defendant, and other defendants, such release would not only endanger the community, it would quickly stretch the bandwidth of existing LM specialists beyond its breaking point.

### VI. The Defendant's Claims Regarding Contact with Counsel Do Not Merit Release.

The Sixth Amendment and needs to consult with counsel in this case can also be accommodated—and should be—without Defendant's release. Given the continuing lack of a suitable third-party custodian (and certainly none anywhere near comparable in responsibility to "a United States marshal" such as envisioned in 18 U.S.C. § 3142(i)), neither 18 U.S.C. § 3142 nor the Sixth Amendment moves the needle toward release here.

Defense Counsel's Doctor-ordered personal quarantine beginning March 27, 2020 does not alter the analysis. Defendant has already participated in an interview with the United States Probation Office for purposes of finalizing a Presentence Investigation Report ("PSR"), and the deadline for making objections to the same passed on March 10, 2020. ECF No. 28, *Regular Sentencing Order*. Nor is there any basis for release if the defendant is unable to get immediate on-demand calls with counsel. DOC has acknowledged that there will be delays in processing legal calls, due to the increase in legal call requests, but has noted that diligent efforts are being made to accommodate all requests under the circumstances. And as of March 25, 2020, DOC also noted that in-person legal visits are still allowed and the most frequently-used option, which includes visits from attorneys and their teams (caseworkers, paralegals, and investigators).

## **Conclusion**

For the foregoing reasons, the Court should deny the defendant's motion for bond review seeking release pending sentencing.

Respectfully submitted,

Robert K. Hur
United States Attorney

/s/
Timothy F. Hagan, Jr.
Assistant United States Attorney

## **CERTIFICATE OF SERVICE**

This is to certify that on this day, **April 1, 2020**, a copy of the foregoing Opposition to Motion for Bond Review was electronically filed and delivered via ECF to counsel of record in this matter.

/s/
Timothy F. Hagan, Jr.
Assistant United States Attorney